RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0213p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAQUAN L. BRIDGES,

*Defendant-Appellant.*

> No. 24-5874

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:23-cr-20080-1—John Thomas Fowlkes, Jr., District Judge.

Argued:  May 7, 2025

Decided and Filed:  August 7, 2025

Before:  BOGGS, GRIFFIN, and NALBANDIAN, Circuit Judges.

———————————

### COUNSEL

**ARGUED:**  Greg Gookin, FEDERAL PUBLIC DEFENDER'S OFFICE, Memphis, Tennessee, for Appellant.  Eileen Kuo, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.  **ON BRIEF:**  Greg Gookin, FEDERAL PUBLIC DEFENDER'S OFFICE, Memphis, Tennessee, for Appellant.  Eileen Kuo, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

GRIFFIN, J., delivered the opinion of the court in which BOGGS, J., concurred. NALBANDIAN, J. (pp. 17–50), delivered a separate opinion concurring in part and concurring in the judgment.

_____

**OPINION**

_____

GRIFFIN, Circuit Judge.

Defendant Jaquan Bridges challenges his conviction for possessing a machinegun in violation of 18 U.S.C. § 922(o), arguing that the statute violates the Second Amendment, facially and as applied to him, under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). For two independent reasons, we disagree. First, controlling Supreme Court and Sixth Circuit precedent—that predates *Bruen* but remains good law—compels our conclusion. In addition, applying *Bruen*'s text-and-history methodology, we conclude that § 922(o) is consistent with our Nation's historical tradition of prohibiting private possession of dangerous and unusual weapons. We thus hold that 18 U.S.C. § 922(o) is constitutional both on its face and as applied to Bridges. Accordingly, we affirm the district court's judgment.

I.

Bridges was driving on a highway in Memphis, Tennessee, when he almost struck a police vehicle. As police tried to stop him, he slowed his car, rolled down the window, and fired several gunshots—one bullet hit the police car and narrowly missed an officer's head. Bridges sped off, leading to a pursuit, which ended when Bridges crashed into a concrete barrier. He crawled out of his car, and officers arrested him and searched his vehicle.

During the search, police found a loaded Glock 23 .40-caliber handgun with an attached "switch"—a device that allows a semi-automatic pistol to fire more than one round of ammunition with a single pull of the trigger. The Bureau of Alcohol, Tobacco, Firearms and Explosives examined the gun and determined that it qualified as a machinegun under federal law. Bridges did not have a valid registration for the machinegun and does not contest that the converted pistol is a machinegun as defined by 26 U.S.C. § 5845(b).

A grand jury indicted Bridges on one count of possessing a machinegun, in violation of 18 U.S.C. § 922(o). He moved to dismiss the indictment, arguing that § 922(o) is

unconstitutional, facially and as applied to him, under *Bruen*. The district court disagreed, held that § 922(o) is constitutional, and denied the motion. Bridges then pleaded guilty to the single count of possessing a machinegun in violation of § 922(o), and the district court sentenced him to 108 months' imprisonment. This appeal followed.

II.

A.

Section 922(o) generally makes it unlawful to "possess a machinegun." *See* 18 U.S.C. § 922(o). A machinegun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The term encompasses parts "for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." *Id.* Machineguns, otherwise known as "fully automatic" weapons, fire multiple rounds when the shooter "[s]imply press[es] and hold[s] the trigger down." *Garland v. Cargill*, 602 U.S. 406, 425 (2024). For example:

> The archetypal modern "machinegun" is the military's standard-issue M16 assault rifle. With an M16 in automatic mode, the shooter pulls the trigger once to achieve a fire rate of 700 to 950 rounds per minute. An internal mechanism automates the M16's continuous fire, so that all the shooter has to do is keep backward pressure on the trigger. If the shooter stops putting pressure on the trigger, the gun stops firing.

*Cargill*, 602 U.S. at 432 (Sotomayor, J., dissenting) (internal citations omitted).

We review the district court's decision about a federal statute's constitutionality de novo. *United States v. Morton*, 123 F.4th 492, 495 (6th Cir. 2024). Although Bridges argues that § 922(o) violates the Second Amendment both on its face and as applied to him, we can analyze those challenges as one. His facial challenge requires him to "establish that no set of circumstances exists under which" § 922(o) is constitutional, yet, as we will explain, "the provision is constitutional as applied to the facts of [Bridge]'s own case." *United States v.*

*Rahimi*, 602 U.S. 680, 693 (2024) (citation omitted).  Thus, his as-applied and facial challenges fail together.

## B.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  As we consider how to apply this text to § 922(o)'s ban on possessing machineguns, three cases—two from the Supreme Court and one from the Sixth Circuit—are key.

### 1.

The first is the Supreme Court's landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008).  At issue there was whether the District of Columbia's ban on handgun possession in the home violated the Second Amendment.  *Id.* at 573.  *Heller* began with a "textual analysis" of the Second Amendment, *id.* at 578, focusing on the text's meaning as it would "have been known to ordinary citizens in the founding generation," *id.* at 577.  To illuminate that original understanding, *Heller* looked to "founding-era sources," *id.* at 584, as well as pre-founding materials to show the "historical background of the Second Amendment," *id.* at 592.  This review of text and history demonstrated that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  *Id.*

*Heller* then consulted other historical sources from "the century after [the Second Amendment's] enactment" to determine whether the Court's interpretation was consistent with "the public understanding" of the Amendment's text.  *Id.* at 605 (emphasis omitted).  These post-founding materials included "analogous arms-bearing rights in state constitutions that preceded and immediately followed adoption of the Second Amendment," *id.* at 600–01—ranging from "Postratification Commentary," *id.* at 605; to "Pre-Civil War Case Law," *id.* at 610; to "Post-Civil War Legislation," *id.* at 614; to "Post-Civil War Commenta[ry]," *id.* at 616.  Such sources led the Court to identify a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Id.* at 627 (collecting sources from the 18th and 19th Centuries).

Next, *Heller* reviewed the Court's prior Second Amendment opinions, including *United States v. Miller*, 307 U.S. 174, 176–78 (1939), which upheld a ban on transporting short-barreled shotguns. *See Heller*, 554 U.S. at 621–25. *Heller* interpreted *Miller* to mean "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625. In other words, *Miller* held that "the *type of weapon at issue*," the short-barreled shotgun, "was not eligible for Second Amendment protection." *Id.* at 622.

*Heller* then considered "*what* types of weapons *Miller* permits." *Id.* at 624. It concluded that *Miller* permits weapons "in common use at the time" that able-bodied men owned and "[o]rdinarily" brought with them when called for militia service. *Id.* (quoting *Miller*, 307 U.S. at 179). Crucially, *Heller* rejected a reading of *Miller* that would protect "only those weapons useful in warfare," reasoning: "That would be a startling reading of [*Miller*], since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* The Amendment's protection of only some weapons, *Heller* explained, fits within the tradition of prohibiting "dangerous and unusual weapons." *Id.* at 627 (citation omitted). Given this understanding, *Heller* made clear that "weapons that are most useful in military service—M–16 rifles and the like—may be banned." *Id.*

Finally, *Heller* rejected the dissent's suggestion that the Second Amendment right should be subject to an "interest-balancing inquiry," under which courts would weigh a regulation's burden on the protected right against its beneficial effects to government interests. *Id.* at 634. Accordingly, it held that "the District's ban on handgun possession in the home violates the Second Amendment." *Id.* at 635.

2.

Shortly after *Heller*, we decided *Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009). There, we rejected a constitutional challenge to § 922(o), holding that *Heller* "directly foreclosed" it. *Id.* at 474. *Hamblen* relied on *Heller*'s statement that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful

purposes." *Id.* (quoting *Heller*, 554 U.S. at 625). And it noted *Heller*'s observation that "it would be a 'startling' interpretation of precedent to suggest that restrictions on machine guns, set forth in the National Firearms Act, might be unconstitutional." *Id.* (quoting *Heller*, 554 U.S. at 624). Thus, *Hamblen* concluded that, "whatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use." *Id.*

3.

Most recently, the Supreme Court decided *Bruen*, holding that a state licensing scheme for the public carrying of firearms violated the Second Amendment right to carry handguns for self-defense. 597 U.S. at 11. *Bruen* began by explaining that, in the years since *Heller*, many lower courts had failed to faithfully apply it: "the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Bruen*, 597 U.S. at 17. *Bruen* held that "the Courts of Appeals' second step—means-end scrutiny—is inconsistent with *Heller*'s historical approach." *Id.* at 24. It thus abrogated many circuit-court decisions that had erroneously applied means-end scrutiny to the Second Amendment right. *See id.* at 19 n.4.

*Bruen* sought to make "more explicit" *Heller*'s Second Amendment standard, which "centered on constitutional text and history." *Id.* at 22, 31. "In keeping with *Heller*," the Court clarified the two-step inquiry for analyzing whether a regulation comports with the Second Amendment. *See id.* at 17. First, courts ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* If so, then "the Constitution presumptively protects that conduct," and courts proceed to the second step—asking whether the government "demonstrate[d] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

This test, *Bruen* explained, is the same one "set forth in *Heller*," which "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 26. "*Heller* itself," *Bruen* emphasized, "exemplifies this kind of straightforward historical inquiry." *Id.* at 27.

### III.

With that background, we first address *Hamblen*'s binding force after *Bruen*. *Hamblen*, if it remains good law, forecloses Bridges's facial and as-applied challenges because it holds that the Second Amendment categorically does not protect the possession of "unregistered machine guns for personal use." 591 F.3d at 474. Ordinarily, holdings of our prior published opinions bind us, but "we may revisit prior published opinions 'if intervening Supreme Court caselaw requires modification.'" *United States v. Cogdill*, 130 F.4th 523, 527 (6th Cir. 2025) (emphasis and citation omitted). Bridges argues that *Bruen*—an intervening Supreme Court decision— requires us to depart from *Hamblen*. We disagree. *Hamblen* straightforwardly applied *Heller*, and *Bruen* did nothing to displace those aspects of *Heller* on which *Hamblen* relied; *Hamblen* therefore remains good law after *Bruen*.

To see why, first consider *Hamblen*'s reasoning. *Hamblen* appropriately applied *Heller*'s statements about machineguns and the types of weapons the Second Amendment protects. *See Hamblen*, 591 F.3d at 474 (quoting *Heller*, 554 U.S. at 625). True, *Heller* was not a case about machineguns, so its machinegun-related statements were arguably dicta. *See Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019). Even so, the *Hamblen* court was "obligated to follow Supreme Court dicta, particularly where there [was] not substantial reason for disregarding it." *Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019) (citation omitted). Absent an intervening Supreme Court case that requires a change, *Hamblen*'s holding based on those Supreme Court statements—dicta or not—is binding. *See Cogdill*, 130 F.4th at 527.

Now consider *Bruen*. It did not call *Heller* into question; to the contrary, *Bruen* was an unqualified endorsement of *Heller*. When *Bruen* articulated its text-and-history test, it stated that it was making *Heller*'s standard "more explicit," *Bruen*, 597 U.S. at 31; that the test was "[i]n keeping with *Heller*," *id.* at 17; and that this test was the same one "set forth in *Heller*," *id.* at 26. In other words, *Bruen* did not assert that *Heller* fell short of its articulated test; rather, *Bruen* stated that "*Heller* itself exemplifies this kind of straightforward historical inquiry." *Id.* at 27.

To be sure, *Bruen* abrogated many lower courts' Second Amendment decisions, but those opinions had *mis*applied *Heller* by erroneously adding a means-end-scrutiny step to *Heller*'s text-and-history standard. *Cf. United States v. Williams*, 113 F.4th 637, 647–48 (6th Cir. 2024) ("[O]ur pre-*Bruen* precedent [with respect to § 922(g)(1)] isn't binding here because intervening Supreme Court precedent demands a different mode of analysis."). *Hamblen*, by contrast, did no such thing. And pre-*Bruen* cases that did not wrongfully apply means-end scrutiny remain binding. *See United States v. Risner*, 129 F.4th 361, 368 (6th Cir. 2025); *see also id.* at 370 (Thapar, J., concurring).

Although *Hamblen* did not conduct its own independent review of text and history, it did not have to—it instead relied entirely on *Heller*'s clear statements, rooted in historical analysis, that applied to machineguns. The historical sources that *Heller* reviewed demonstrate a "tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627 (collecting sources). And that tradition supports the corollary that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. With that foundation, *Heller* declared in no uncertain terms that "weapons that are most useful in military service," such as "M-16 rifles and the like," can be "banned" without offending the Second Amendment. *Id.* at 627. And it stated that it would be "startling" to interpret *Miller* in a way that would mean that federal "restrictions on machineguns . . . might be unconstitutional." *Id.* at 624.

Accordingly, *Hamblen* faithfully applied *Heller* and reasonably came to the only conclusion that could logically follow: § 922(o)'s ban on machinegun possession is constitutional. If *Heller* was rooted in history, then so too was *Hamblen*. *Hamblen* did not conduct interest-balancing or means-end tests; rather, it straightforwardly applied *Heller*, a case that *Bruen* emphatically endorsed. Thus, even in *Bruen*'s wake, *Hamblen* remains binding authority. And under that precedent, § 922(o) does not violate the Second Amendment facially or as applied to Bridges.

IV.

Moreover, even if *Hamblen* does not control here, a fresh application of the *Heller*/*Bruen* text-and-history test yields the same result. Recall *Bruen*'s two steps. First, we ask whether "the Second Amendment's plain text covers" the conduct at issue—if so, then "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Second, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

A.

At step one, we must determine whether "the Second Amendment's plain text covers" Bridges's possession of a machinegun. *Id.* at 17. On this issue, the Supreme Court has previously instructed our decision. As discussed above, *Heller* analyzed how the Amendment's text would "have been known to ordinary citizens in the founding generation." 554 U.S. at 576–77. That analysis showed that the Amendment "'guarantee[s] the individual right to *possess* and carry weapons in case of confrontation' that does not depend on service in the militia." *Bruen*, 597 U.S. at 20 (first alteration in original) (emphasis added) (quoting *Heller*, 554 U.S. at 592). Thus, the text plainly covers the conduct of possession.

The remaining textual question is whether the term "Arms" encompasses machineguns. Again, on this point, the Supreme Court has concluded that the 18th Century meaning of "Arms" is "no different" than today's. *Heller*, 554 U.S. at 581. "Arms" meant "[w]eapons of offence," *id.* (alteration in original) (quoting 1 Samuel Johnson, Dictionary of the English Language 106 (4th ed. 1773) (reprinted 1978)), and "any thing that a man . . . takes into his hands, or useth in wrath to cast at or strike another," *id.* (first quoting 1 Timothy Cunningham, A New and Complete Law Dictionary (1771); and then citing Noah Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Indeed, to the founding generation, "all firearms constituted 'arms.'" *Id.* at 581–82 (citing 1 John Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 37 (3d ed. 1794)). True, machineguns did not exist at the time of the founding—the modern, fully automatic machinegun would not be invented until 1884. David B. Kopel, *Machine Gun History and Bibliography*, 25 Wyo. L. Rev.

45, 74 (2025).  But the term "Arms" in the Second Amendment extends "to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *Rahimi*, 602 U.S. at 691 (noting that the Second Amendment is not "a law trapped in amber").

Although machineguns come in various forms, a machinegun—such as a handgun modified for fully automatic fire—is undoubtedly an "Arm[]" that one can "keep and bear." Thus, the Second Amendment's plain text covers Bridges's possession of a machinegun, and "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24; *accord Rahimi*, 602 U.S. at 691.  Accordingly, we proceed to *Bruen*'s second step.

## B.

For § 922(o) to pass constitutional muster, the government must demonstrate that the statute "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.  To do so, the government must identify a historical law that is analogous, or "relevantly similar," to the challenged regulation.  *Id.* at 28–29; *see also Rahimi*, 602 U.S. at 692. The historical law "need not be a 'dead ringer' or a 'historical twin'" to the modern regulation. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).  What matters is whether the regulation "comport[s] with the principles underlying the Second Amendment."  *Id.*

Once again, *Heller*'s historical review sets the stage.  From that review, *Heller* derived the principle that the right protected by the Second Amendment "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  554 U.S. at 626.  Indeed, *Heller* identified a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Id.* at 627 (collecting historical sources).  Thus, whether machineguns fall within the right's historical scope turns on whether machineguns are "dangerous and unusual."

### 1.

An object is "dangerous" if it is "likely to cause serious bodily harm."  *Dangerous*, Black's Law Dictionary (12th ed. 2024) (providing the example of "a dangerous weapon").  A

machinegun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b).

> Machineguns are plainly dangerous. As the Ninth Circuit aptly put it:
>
> The machine gun was first widely used during World War I, where it "demonstrated its murderously effective firepower over and over again." William Rosenau, Book Note, *The Origins of the First Modern Weapon*, Tech. Rev., Jan. 1987, at 74, (reviewing John Ellis, *The Social History of the Machine Gun* (1986)). A modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds. *See George C. Wilson, Visible Violence*, 12 Nat'l J. 886, 887 (2003). Short of bombs, missiles, and biochemical agents, we can conceive of few weapons that are more dangerous than machine guns.

*United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (holding that § 922(o) does not violate the Second Amendment because machineguns are "dangerous and unusual weapons").

Bridges argues that the dangerousness inquiry should not focus solely on the machinegun but rather on how he carried, displayed, or used it. *Heller* states otherwise: "the Second Amendment right, whatever its nature, extends only to certain types of weapons." 554 U.S. at 623. When it comes to "*type[s] of weapon[s]*" that are "not eligible for Second Amendment protection," the manner of possession is irrelevant. *See id.* at 622.

But even if we considered the manner of Bridges's possession to evaluate dangerousness, his argument fails. Far from the hypothetical defendant who locked a machinegun "in a gun safe in his basement for twenty years without touching it," *see United States v. Morgan*, 2024 WL 3936767, at *4 (D. Kan. Aug. 26, 2024), Bridges fired a machinegun at a police officer from a moving car on a public highway. In sum, regardless of whether we measure dangerousness by the weapon itself or the manner of possession, both were dangerous here.

2.

Next, we ask whether machineguns are "unusual." For this inquiry, we focus on whether machineguns are weapons that are "in common use" or "typically possessed by law-abiding

citizens for lawful purposes" like "self-defense." *Heller*, 554 U.S. at 624–25 (citation omitted); *see also Bruen*, 597 U.S. at 32, 51–52 & n.15.

The parties frame this inquiry around machinegun-ownership data, *see, e.g.*, *Hollis v. Lynch*, 827 F.3d 436, 448–50 (5th Cir. 2016), *abrogated by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024), but disagree on the relevant figure to apply. Bridges asserts that there are over 740,000 total registered machineguns in the United States and that the number in "common use" is even higher because we must account for "unlawfully owned machine guns." (Citing *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015)). The government responds that most of those registered machineguns are possessed by law enforcement, a category exempt from the possession ban and one that should not count toward guns in common use. *See* 18 U.S.C. § 922(o)(2)(A). Excluding law-enforcement equipment, the government asserts that there are around 175,977 registered machineguns—the number grandfathered into lawful registration before § 922(o)'s 1986 enactment. (Citing *Hollis*, 827 F.3d at 449 (citing ATF statistics)). *See* Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102, 100 Stat. 449 (1986) (codified at 18 U.S.C. § 922(o)(2)(B)). The government further contends that we should not count unlawfully owned guns.

We agree with the government. First, the relevant number excludes law-enforcement equipment. *Heller* establishes that the Second Amendment's historical scope protects only those "weapons used in defense of person and home," 554 U.S. at 625 (citation omitted)—"the sorts of lawful weapons that" citizens "possessed at home" and would "bring" with them "to militia duty," *id.* at 627. We thus do not count "sophisticated arms" obtained through a special law-enforcement statutory exception and used to equip a modern-day, militarized police force. *See id.*; *see also* Cadman Robb Kiker III, *From Mayberry to Ferguson: The Militarization of American Policing Equipment, Culture, and Mission*, 71 Wash. & Lee L. Rev. Online 282, 285 (2015) (describing how the trend toward police militarization in the United States "began in the 1960s" with the creation and proliferation of "Special Weapons and Tactics (SWAT)" teams). Second, we do not count unlawfully owned weapons for this constitutional inquiry. The Amendment's protection extends only to those weapons "typically possessed by law-abiding

citizens for lawful purposes," *Heller*, 554 U.S. at 625, and law-abiding citizens definitionally do not possess unregistered machineguns nearly 40 years after § 922(o)'s enactment.

Thus, we proceed with the understanding that there are around 175,977 civilian-owned, lawfully registered machineguns in the United States. The government argues that number is a small fraction of the 300 million to 500 million privately owned firearms in the United States and that machineguns are therefore unusual.

But as Bridges counters, and as several cases illustrate, deciding whether weapons are "unusual" requires more than simply contrasting the number of that kind of weapon against the total number of firearms. *See Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring). For instance, in *Caetano*, the Supreme Court held that the Second Amendment's protection may extend to stun guns, *id.* at 412 (majority opinion), of which there were "approximately 200,000" owned by civilians as of 2009, *id.* at 420 (Alito, J., concurring) (citation omitted). Similarly, the Eastern District of New York determined that chuka sticks, or nunchaku, were "in common use" where "at least 64,890 metal and wood nunchaku were sold on the retail market in the United States between 1995 and 2018." *Maloney v. Singas*, 351 F. Supp. 3d 222, 232–33, 237 (E.D.N.Y. 2018). And the Northern District of New York held that tasers were "in common use" in part because at least 300,000 such weapons were owned by civilians. *Avitabile v. Beach*, 368 F. Supp. 3d 404, 411–12, 421 (N.D.N.Y. 2019). Bridges, citing these cases, asserts that machineguns too are common. As he argues, 175,977 (the number of lawfully owned machineguns) is greater than *Maloney*'s 64,890 nunchaku and comparable to *Caetano*'s 200,000 stun guns or *Avitabile*'s 300,000 tasers.

Yet these weapons—stun guns, nunchaku, and tasers on the one hand and machineguns on the other—are not comparable when it comes to whether they are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. For starters, as Bridges admits—and as his own illegal machinegun demonstrates—many machineguns are owned unlawfully, in violation of a federal ban that has been in place for nearly four decades, not to mention the laws of many states, such as Tennessee, that criminalize the private possession of machineguns or conversion devices. *See, e.g.*, Tenn. Code § 39-17-1302(a)(3). And even assuming that the grandfathered-in machineguns are "possessed by law-abiding citizens for

lawful purposes," *Heller*, 554 U.S. at 625, those weapons were all in existence (and registered) before 1986.  Indeed, "private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986" under federal law.  *Henry*, 688 F.3d at 640.  Thus, a significant, albeit unknown, number of machineguns "exist on the black market," *id.*, and are not "possessed by law-abiding citizens," *Heller*, 554 U.S. at 625.

And machineguns—unlike stun guns, nunchaku, and tasers—are designed for a specific function:  to fire as many bullets in as little time as possible.  *See Cargill*, 602 U.S. at 432–33 (Sotomayor, J., dissenting).  That function makes this type of weapon exceedingly dangerous and uniquely adapted for unlawful purposes.  Although stun guns and tasers, "like handguns, are weapons that can injure or kill," *Avitabile*, 368 F. Supp. 3d at 413 (citation omitted); *see also Caetano*, 577 U.S. at 413 (Alito, J., concurring), they cannot "kill dozens of people within a matter of seconds," *Henry*, 688 F.3d at 640.  Likewise, people typically possess nunchaku—"a tool from the sphere of martial arts"—"for recreational and other lawful purposes."  *Maloney*, 351 F. Supp. 3d at 235 (citation omitted).  They, unlike machineguns, have "no special propensity for unlawful use."  *Id.* at 236.

As the en banc Fourth Circuit recently explained in *Bianchi v. Brown*:  What puts weapons like short-barreled shotguns and machineguns beyond the Second Amendment's scope "is their ability to inflict damage on a scale or in a manner disproportionate to the end of personal protection."  111 F.4th 438, 451 (4th Cir. 2024) (en banc), *cert. denied sub nom.*, *Snope v. Brown*, 145 S. Ct. 1534 (2025) (mem.).  Unlike the handgun—"the most popular weapon" for "the core lawful purpose of self-defense," *Heller*, 554 U.S. at 629–30; *see also Bruen*, 597 U.S. at 29—machineguns are "excessively dangerous weapons ill-suited and disproportionate to such a purpose," *Bianchi*, 111 F.4th at 452.

Indeed, the machinegun's historical connection to crime in the United States illustrates its lack of connection to lawful purposes.  As *Bianchi* explains, after World War I, machineguns became popular "with criminals, especially bootleggers."  *Id.* at 469 (quoting David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 287 n.490 (2024)); *see also* Robert J. Spitzer, *Understanding Gun Law History After* Bruen*: Moving*

*Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 63 (2023). Civilians and police were slow to adopt these new weapons, so "early 20th-century criminals gained access to weapons with firepower not seen before in civilian life." *Bianchi*, 111 F.4th at 469. Criminal machinegun use "exacted a devastating toll," compelling legislative responses to the violence. *Id.* at 469–71 (citation omitted). Such responses included the National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified at 26 U.S.C. § 5849), "which severely curtailed the civilian possession and general circulation of automatic weapons," *Bianchi*, 111 F.4th at 470, and, eventually, the Firearm Owners' Protection Act of 1986, which codified the possession ban at issue here, Pub. L. No. 99-308, § 102, 100 Stat. 449.

Consequently, by the end of the 20th Century, the Supreme Court recognized that machineguns are not weapons typically possessed by law-abiding citizens for lawful purposes. *See Staples v. United States*, 511 U.S. 600, 611–12 (1994) (classifying "machineguns, sawed-off shotguns, and artillery pieces" as weapons that share "the same quasi-suspect character" as hand grenades); *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality) (observing that the National Firearms Act, which regulates machineguns, was intended "to regulate certain weapons likely to be used for criminal purposes"). It is thus no wonder that *Heller* expressed that it would be "startling" if federal "restrictions on machineguns . . . might be unconstitutional." 554 U.S. at 624. Machineguns are, after all, "weapons most suitable for criminal or military use." *Bianchi*, 111 F.4th at 451. They "are not the modern equivalents of weapons that were commonly possessed and employed for self-preservation by your shopkeeper, or your butcher, or your blacksmith up the road in colonial America—the disarmament of whom the Second Amendment was ratified to prevent." *Id.* at 452.

In the face of ample evidence that unregistered machineguns are not typically possessed by law-abiding citizens for lawful purposes, Bridges merely asserts (without citation) that machineguns "continue to be in many homes for self-protection today." The evidence suggests otherwise. Modern machineguns, capable of firing hundreds of rounds per minute, *Cargill*, 602 U.S. at 432 (Sotomayor, J., dissenting); *Henry*, 688 F.3d at 640, are far more "useful for offensive and criminal purposes" and for "inflicting mass horrors" than they are for lawful

purposes like self-defense, *Bianchi*, 111 F.4th at 471.  Given machineguns' lack of connection to lawful purposes, they are "unusual" under *Heller*.

C.

Machineguns are both dangerous and unusual—not weapons typically possessed by law-abiding citizens for lawful purposes.  Accordingly, § 922(o)'s ban on machinegun possession "is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 597 U.S. at 24.  Bridges's facial and as-applied challenges to the constitutionality of this statute therefore fail.

V.

For these reasons, we affirm the district court's judgment.

---

## CONCURRING IN PART AND CONCURRING IN THE JUDGMENT

---

NALBANDIAN, Circuit Judge, concurring in part and concurring in the judgment. I agree that we should affirm Jaquan Bridges's conviction. But my thinking differs from the majority's. Plain-error review and a facial analysis suffice to resolve this case without making broader pronouncements about machineguns and the history of "dangerous and unusual" weapons. Respectfully, "[i]f it is not necessary to decide more, it is necessary not to decide more." *BellSouth Telecomms., Inc. v. Farris*, 542 F.3d 499, 505 (6th Cir. 2008) (alteration in original) (quoting *PDK Lab'ys Inc. v. U.S. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment)). I write separately to explain my thinking. And I identify the weightier historical questions that this case implicates, though I leave their resolution for another day.

First, the federal machinegun ban at 18 U.S.C. § 922(o) isn't facially unconstitutional. And the district court didn't plainly err in applying it to Bridges. So his conviction should stand. I'd leave things at that.

Because the majority chooses a broader holding, I'll address some of the majority's reasoning, and where I depart from it. I agree that the majority identifies the right historical tradition—regulations of dangerous and unusual arms—for testing the statute's constitutionality under the Second Amendment. And I agree with the majority's decision to analyze this tradition under *Bruen*'s so-called "Step 2," not "Step 1." But I don't share the majority's confidence about how we should understand dangerous and unusual weapons. To my mind, the historical record raises hard questions that haven't been satisfactorily addressed. I express no opinion today on the statute's validity as applied to future defendants, but I'll walk through some of that history and flag some doctrinal quirks and complications.

Finally, I cannot join the majority's dicta about our old, pre-*Bruen* decision in *Hamblen v. United States*. *Hamblen* upheld the machinegun ban—but with very little analysis. 591 F.3d 471, 473–74 (6th Cir. 2009). *Bruen*, which requires a specific mode of historical inquiry, has

superseded *Hamblen* and returned us to square one.  Because the majority rightly conducts a fresh Second Amendment analysis today, I see no reason to suggest that *Hamblen* lives on.  Time has passed *Hamblen* by.

## I.

I'll start with the straightforward part.  Bridges brings a facial challenge and an unpreserved, as-applied challenge to his conviction for possessing a machinegun.  Both challenges fail.

## A.

First, the facial challenge.  Since 1986, the federal government has banned the possession or transfer of machineguns.  *See* 18 U.S.C. § 922(o)(1).  The statute makes exceptions for machineguns lawfully owned before 1986 and for law enforcement.  *Id.* § 922(o)(2).  What is a "machinegun"?  The statute incorporates the definition from the National Firearms Act of 1934. *Id.* § 921(a)(24).  Under that Act, a machinegun "means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b).[1]  That definition includes standard, fully automatic rifles like M-16s.  But it also covers unconventional automatic firearms, like the Glock-switch-modified pistol Bridges had.  And it extends to much larger, heavy-duty machineguns, like autocannons (or machinegun cannons), massive guns mounted on military aircraft and anti-aircraft batteries.  *See* David B. Kopel, *Machine Gun History and Bibliography*, 25 Wyo. L. Rev. 45, 63 (2025); *United States v. Morgan*, No. 23-10047, 2024 WL 3936767, at *2 (D. Kan. Aug. 26, 2024).

Bridges challenges § 922(o) on its face.  "This is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists

---

[1]The definition also includes the frames or receivers of such weapons, any parts designed or intended to convert a weapon into a machinegun, and certain parts from which a machinegun can be assembled.  *See* 26 U.S.C. § 5845(b).

Bridges indisputably carried a machinegun.  He had a pistol with a Glock switch, a small device (a piece of metal) that converts a semiautomatic pistol into an automatic one.  As a conversion device, the switch itself is a "machinegun" under the statutory definition.  And an assembled or converted fully automatic pistol is, of course, also a machinegun.

under which the Act would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). So if we can find a constitutional application of the machinegun ban, the facial challenge fails.

We can find one. The Second Amendment protects bearable arms—those you can carry—and § 922(o) bans private possession of some things, like autocannons, that are not bearable arms.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. It "extends, prima facie, to all instruments that constitute *bearable arms*." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28 (2022) (emphasis added) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)); *see also Duncan v. Bonta*, 133 F.4th 852, 908 (9th Cir. 2025) (en banc) (Bumatay, J., dissenting) (explaining how nonbearable weapons "aren't protectable 'Arms' under the Second Amendment"). To "bear" arms means to carry them. *Heller*, 554 U.S. at 584–87. If you cannot carry a thing, you cannot bear it. And if a weapon isn't "bearable" by an ordinary soldier or hunter, it doesn't implicate the Second Amendment.[2]

Aircraft-mounted machineguns may be "arms," but they aren't bearable in ordinary hands. So there's no constitutional right to own them. The government may ban them from private possession. That likely goes for other heavy machineguns, too, such as some tripod-mounted machineguns, carried around in pieces but stationary when assembled. *See* Kopel, *supra*, at 63–64.

So to restate the obvious: The Second Amendment doesn't protect individual ownership of autocannons just as it doesn't protect private ownership of tanks, bombers, and trebuchets (not bearable), or eggplants, chickens, and televisions (not arms). Section 922(o) thus has some constitutional applications. And Bridges's facial challenge has no merit.

---

[2] At the Founding, some definitions of "arms" even had "bearability" built into them. *See District of Columbia v. Heller*, 554 U.S. 570, 581 (2012) (discussing one legal dictionary's definition of arms as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another").

**B.**

Neither does his as-applied challenge.  In his motion to dismiss, Bridges didn't develop any argument that § 922(o) violates the Constitution as applied to him, meaning he forfeited the issue and we review for plain error.**3**  *See United States v. Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016).

To succeed on plain error, the defendant must show "(1) an error, (2) that was obvious or clear, (3) that affected the defendant's substantial rights, and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Bauer*, 82 F.4th 522, 530 (6th Cir. 2023).  It's an extremely high standard.  The alleged error must have been "clearly contrary to the law at the time of appeal" such that there is no room for reasonable dispute. *United States v. Tellez*, 86 F.4th 1148, 1154 (6th Cir. 2023) (internal quotation marks omitted). "Only in exceptional circumstances" is an error so plain that the district judge was "derelict" in letting it to go forward.  *United States v. Emuegbunam*, 268 F.3d 377, 406 (6th Cir. 2001).

We have nothing of the kind here.  It's by no means "obvious or clear" that § 922(o) is unconstitutional, if it is at all.  *Bauer*, 82 F.4th at 530.  Neither was convicting Bridges "clearly contrary to the law" or beyond any "reasonable dispute."  *Tellez*, 86 F.4th at 1154.  No court of appeals has held § 922(o) unconstitutional.  And the government's brief lists dozens of district courts, including in this circuit, that have upheld the statute.  *See* Appellee Br. at 15–16 n.1. Only one or two district courts have found the statute unconstitutional, and those cases have appeals pending.**4**  At least for now, the caselaw consensus favors the statute's lawfulness.

Plain-error review thus precludes Bridges's as-applied claim.

**II.**

That's how I would decide this case.  But the majority chooses a different path, giving full review to the statute's consistency with our historical tradition of regulating "dangerous and

---

**3**His motion to dismiss made one reference to an as-applied challenge, in a single sentence, with no citation to any authority or theory of how the as-applied challenge would work. R. 24, Mot. to Dismiss, p.6, PageID 34.

**4***See United States v. Morgan*, No. 23-10047, 2024 WL 3936767, at *4 (D. Kan. Aug. 26, 2024); *United States v. Brown*, 764 F. Supp. 3d 456, 464 (S.D. Miss. Jan. 29, 2025) (order).

unusual weapons." Because the majority does so, I will also address the "dangerous and unusual weapons" doctrine. I do not express any opinion on whether history and tradition justify § 922(o), but I'll offer some observations and explain why I do not share the majority's certainty about how this doctrine should work.

Firearms regulations come in many flavors. Some regulate *who* can bear arms. Some regulate *how* you can bear arms. Some regulate *where* you can bear arms. *See United States v. Williams*, 113 F.4th 637, 643 (6th Cir. 2024) (law banning felons from owning guns); *Bruen*, 597 U.S. at 9–11 (law regulating public carry); *Heller*, 554 U.S. at 626 (discussing "sensitive places," like schools and government buildings).

Today's case presents a different kind of regulation: *What* arms can you keep? May the government ban certain bearable weapons? If so, which ones?

## A.

First, some preliminaries.

When the Founding generation adopted the Second Amendment, they recognized and codified a preexisting, fundamental right. *Heller*, 554 U.S. at 592. With deep roots in the common law and the natural-law tradition, the right to bear arms was considered a component, or auxiliary right, of the natural right to self-defense. *See* 2 William Blackstone, *Commentaries on the Laws of England* 143 (St. George Tucker ed., 1803) (1765). As James Wilson put it, citing Cicero, the "defence of one's self, justly called the primary law of nature, is not, nor can it be abrogated by any regulation of municipal law." James Wilson, *Of the Natural Rights of Individuals*, *in* 2 Collected Works of James Wilson 1082 (Kermit L. Hall & Mark David Hall eds., 2007) (footnote omitted). Thus, Wilson explained, keeping arms and using lethal force was justified to protect home and homeland—when "necessary for the defence of one's person or house" and when "necessary for the defence of the United States." James Wilson, *Of Crimes Against the Right of Individuals to Personal Safety*, *in* 2 Collected Works of James Wilson, *supra*, at 1141–42; *see also Nunn v. State*, 1 Ga. 243, 251 (1846) (roughly equating the "constitutional right to keep and bear arms" with the "*natural* right of self-defence"). The Founding generation enumerated the right in the Constitution (and in their state

constitutions[5]) because they thought it fundamental; it wasn't fundamental because it was enumerated.[6]

As a fundamental right, not the creation of any one locality, the right to bear arms had general, trans-jurisdictional contours. Early state courts often treated the Second Amendment as functionally equivalent to state constitutional counterparts, despite minor textual variations. *See* William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1472 & n.25 (2024). These constitutional provisions were all thought to codify the same preexisting right. So state courts considered the views of other state courts, as well as the right's historical origins, when analyzing the right's scope. *See id.*

Like any right, of course, the right to bear arms came with limits, often based on the natural-rights principle that "no man can so use his own as to violate the rights of others, or of the community." *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178–79, 185 (1871). The common law and legislatures developed the scope of the right over the centuries. Some of these historically defined limits were more fixed; for others, legislatures had breathing room to enact reasonable regulations to promote the public good.[7] *See* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 L. & Contemp. Probs. 31, 35–37 (2020) (discussing eighteenth-century social-contract theory). We continue to recognize these principles today. *See Heller*, 554 U.S. at 626 ("[T]he right secured by the Second Amendment is

---

[5]*See McDonald v. City of Chicago*, 561 U.S. 742, 769 (2010).

[6]*See* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 L. & Contemp. Probs. 31, 51 (2020) ("The right to keep and bear arms was widely recognized as a historically grounded rule—not something created through its enumeration in state and federal constitutions. Its force and meaning therefore depended on its historical scope—not on its textual enumeration."); *see also United States v. Cruikshank*, 92 U.S. 542, 553 (1875) ("This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence.").

[7]Limits from the common law and statutory law often overlapped. Both common-law doctrines and legislatures reinforced the natural-law outlook, preventing you from interfering with the rights of others. *See State v. Buzzard*, 4 Ark. 18, 41–42 (1842) (opinion of Lacy, J.). Statutory regulations of the right to bear arms often "declared," or reaffirmed, the right's natural-law or common-law limits. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022); *United States v. Rahimi*, 602 U.S. 680, 697–98 (2024); Jud Campbell, *Determining Rights*, 138 Harv. L. Rev. 921, 931–36 (2025). Other times, statutes "specified" limits that were "out there" in principle but underdetermined. *See In re Opinion of the Justices*, 80 Mass. (14 Gray) 614, 620 (1859) (explaining that the Second Amendment "declares a great general right, leaving it for other more specific constitutional provision or to legislation to provide for the preservation and practical security of such right"); *see also* Campbell, *Determining Rights*, at 931–36. Still other times, legislatures innovated.

not unlimited."). Regulations of the right, though, couldn't nullify the core of the right. Statutes "which, under the pretence of regulating, amount[ed] to a destruction of the right, or which require[d] arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." *State v. Reid*, 1 Ala. 612, 616–17 (1840).**[8]**

The right's contents—its reach and its limits—were determined by historical practice and cannot be uncovered by text alone. While the text makes some things clear (what's protected? "arms," not eggplants), for many questions we must resort to historical understandings of the scope of the right, just as courts have long done. *See Aymette v. State*, 21 Tenn. (2 Hum.) 154, 156 (1840) ("In order to have a just and precise idea of the meaning of the clause of the constitution under consideration, it will be useful to look at the state of things in the history of our ancestors, and thus comprehend the reason of its introduction into our constitution.").**[9]** To borrow Justice Frankfurter's classic metaphor, at ratification the right "br[ought] the old soil with it." *Cf.* Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947).

So Second Amendment law is the law of the Second Amendment at ratification plus any subsequent lawful developments. And to understand what about the right to bear arms comes fixed and what comes subject to change, we examine "this Nation's historical tradition of firearm regulation." *Bruen* 597 U.S. at 17. Of course, the law isn't "trapped in amber." *Rahimi*, 602 U.S. at 691. But modern regulations of arms must be "consistent with the principles that underpin our regulatory tradition." *Id.* at 692. Today's rules must be "relevantly similar" to yesterday's. *Bruen*, 597 U.S. at 29.

---

**[8]***See also Nunn v. State*, 1 Ga. 243, 249 (1846); *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 159 (1840) ("And, although this right must be inviolably preserved, yet it does not follow that the Legislature is prohibited altogether from passing laws regulating the manner in which these arms may be employed."); *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 181 (1871) ("The power to regulate, does not fairly mean the power to prohibit [arms]; on the contrary, to regulate, necessarily involves the existence of the thing or act to be regulated.").

**[9]***See also Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (Ky. 1822) (noting that the "right existed at the adoption of the [Kentucky] constitution," and describing how statutes that "diminish or impair it as it existed when the constitution was formed, are void"); *State v. Reid*, 1 Ala. 612, 615 (1840) (analyzing the English Bill of Rights); *State v. Huntly*, 25 N.C. (3 Ired.) 418, 420–22 (1843); *English v. State*, 35 Tex. 473, 479 (1871).

To discern whether a modern regulation is relevantly similar to a historical analog, we typically look at two features: *Why* the two regulations burden the right, and *how* they do so. *Id.* In other words, we look to the regulations' *ends* and *means*. To be clear, this undertaking doesn't involve judicial policy balancing or the so-called tiers of scrutiny (which *Bruen* rejected). Rather, our ends-means analysis is a "*comparative* one," a historical inquiry "where the baseline comparator is supplied by the people through historical tradition." J. Joel Alicea, Bruen *Was Right*, 174 U. Pa. L. Rev. (forthcoming 2025) (manuscript at 67); *see Bruen*, 597 U.S. at 29 n.7.

With these principles in mind, let's turn to the history.

## B.

One prominent historical regulatory tradition, stretching back through English and early American law, involved "dangerous and unusual weapons."

*Heller* mused on this tradition in passing, when discussing limits on the right to bear arms. In dicta, the Court remarked: "[Precedent dictates] that the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 627 (citation and internal quotation marks omitted). The Court then offered as support a string cite to Blackstone, James Wilson, six early American criminal-law treatises, and four nineteenth-century state cases. *Id.*

To operationalize this doctrine, we must ask two questions. First, what makes a weapon dangerous and unusual? (This question roughly tracks *Bruen*'s "why"; we ask what about certain weapons warrants special rules.) Second, what kind of regulations can be applied to such weapons? (*Bruen*'s "how.")

Because this doctrine was not before the Court in *Heller*, the Court didn't spend much time on it. Neither has it had the chance to revisit the issue in the years since. To date, the Court has not decided on a "comprehensive framework for evaluating restrictions on types of weapons," and it has left "open essential questions such as what makes a weapon 'bearable,' 'dangerous,' or 'unusual.'" *Harrel v. Raoul*, 144 S. Ct. 2491, 2492 (2024) (mem.) (Thomas, J.,

statement respecting denial of certiorari).  In a short unsigned opinion, the Court once reversed a state court for mangling *Heller*'s test and putting stun guns outside the Second Amendment's reach because they were "unusual" at the Founding.  *Caetano v. Massachusetts*, 577 U.S. 411, 412 (2016) (per curiam).  But that's it.  Other than a few suggestions from *Heller* and *Caetano*, our guidance must come from history itself, not from above.

On to the history.

## 1.

Let's begin with a remarkable fact.  From what we can tell, no American jurisdiction prohibited any kind of weapon in the eighteenth century.  *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 226, 261–62 (2024).[10]  They had regulations on *who* could have arms or *how* you could carry arms, but not on *what* arms you could have.  If a weapon existed, you could own it.  The leading historical study surveying restrictions on types of arms summarizes things this way:  "Before, during, and after the Revolution, no state banned any type of arm, ammunition, or accessory.  Nor did the Continental Congress, the Articles of Confederation Congress, or the federal government created by the U.S. Constitution in 1787."  *Id.* at 261.  And to my knowledge, no court or scholar has identified any historical example to the contrary.  *E.g.*, *Bianchi v. Brown*, 111 F.4th 438, 532 (4th Cir. 2024) (en banc) (Richardson, J., dissenting) ("The majority does not identify any laws from this period limiting the possession of especially dangerous weapons.").

Eighteenth-century patterns of weapons ownership would shock some modern sensibilities.  Far from banning any weapons, colonies often imposed arms-bearing mandates on private citizens for public-safety reasons.  *See Heller*, 554 U.S. at 601.  Men, and in some cases women, were expected to have—and be proficient in the use of—weapons ranging from muskets, rifles, and pistols, to sabers, bayonets, and tomahawks, in case the community needed

---

[10]Things don't change much if we peek back at the seventeenth century, either.  Apparently, the only restriction in the 1600s "involving specific arms was a handgun and knife carry restriction enacted in Quaker-owned East New Jersey in 1686."  David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 238 (2024).  It lasted only a few years, and "imposed no restriction on the possession or sale of any arms."  *Id.*  And, whatever the regulation did, a few "years of history in half a Colony roughly a century before the founding sheds little light on how to properly interpret the Second Amendment."  *Bruen*, 597 U.S. at 49.

to defend itself. *See* Kopel & Greenlee, *supra*, at 241–54. Certain repeating rifles (which did exist in the 1700s) circulated in private hands in the colonies and the early republic. *Id.* at 254–57. The Continental Congress even tried to order some for George Washington's troops, though they proved too expensive. *Id.* at 255–56. Cannons were also privately owned at this time.[11] *Id.* at 257–60.

The takeaway here isn't difficult. The historical record before 1800 offers no support for a ban on any class of arms.

### 2.

But wait, you might ask—what about the old common-law tradition of banning dangerous and unusual arms? The short answer is that there was no such tradition, neither at the Founding nor in the republic's early decades. Our nation, like England, had a historical tradition of regulating the *manner of carry* of dangerous and unusual arms. But outright statutory bans— on possession or sale—came much later.

The "dangerous and unusual weapons" doctrine derived from the common-law offense of "going armed." As Blackstone summarized it, the "offence of *riding* or *going armed*, with dangerous or unusual weapons, [was] a crime against the public peace, by terrifying the good people of the land; and [was] particularly prohibited by the statue of Northampton." 5 Blackstone, *supra*, at 148; *see also Sir John Knight's Case*, 87 Eng. Rep. 75, 75–76 (KB 1686).[12] Note Blackstone's phrasing. The offense consisted not of *possessing* dangerous or unusual weapons, but of displaying or wielding them in public intending to cause a public

---

[11]Cannons, of course, are not "bearable" arms. *See supra* Part I.A.

[12]Curiously, the Statute of Northampton did not itself use the words "dangerous and unusual." It provided that Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night or by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. 3 c.3 (Eng. 1328). The gloss of "dangerous and unusual weapons" seems to have been developed sometime between the fourteenth century and the eighteenth century.

terror.[13]  *See also Rex v. Knight*, 90 Eng. Rep. 330, 330 (KB 1686) (discussing the "malo animo" element); *Bruen*, 597 U.S. at 43–44.

The going-armed offense crossed the Atlantic with the common law and was a cognizable crime in American jurisdictions.  *See State v. Langford*, 10 N.C. (3 Hawks) 381, 383–84 (1824); *State v. Huntly*, 25 N.C. (3 Ired.) 418, 420–23 (1843); *O'Neill v. State*, 16 Ala. 65, 67 (1849).  And the crime still comprised a certain manner of publicly carrying certain weapons plus the *in terrorem* mens rea.  It was not unlawful simply to possess or sell dangerous and unusual weapons, or even to bear them in public without criminal intent.[14]  As the North Carolina Supreme Court explained, at common law "the carrying of [such a weapon] per se constitutes no offence.  For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry [it].  It is the wicked purpose—and the mischievous result—which essentially constitute the crime."  *Huntly*, 25 N.C. (3 Ired.) at 422–23.

### 3.

If we move from the common law to early statutory law, we see the same story.  Well before the Revolution and the Constitution, a few colonies passed going-armed statutes.  *See Bruen*, 597 U.S. at 46.  But "[f]ar from banning the carrying of any class of firearms, [these statutes] merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself."  *Id.* at 47.  As discussed, before 1800, bans on types of arms were a kind of regulation that seems not to have existed.

Things change little if we press forward into the early nineteenth century.  Start with firearm regulation.  From the Founding to the Civil War, only one state enacted a law banning the possession or sale of any kind of firearm.  Kopel & Greenlee, *supra*, at 287.  An 1837 Georgia act made it unlawful for anyone "to sell, offer to sell, or to keep or to have about their

---

[13]Note also that Blackstone wrote "dangerous *or* unusual," not "dangerous *and* unusual."  I'll return to this in Part II.C.3.

[14]And of course, "wearing common weapons" did not violate the traditional going-armed laws.  1 William Oldnall Russell, *A Treatise on Crimes and Indictable Misdemeanors* 272 (2d ed. 1831).

persons" any pistol, among other weapons. *Nunn*, 1 Ga. at 246.[15]  The statute didn't last long.
The Georgia supreme court declared it unconstitutional in *Nunn v. State*, a celebrated antebellum
case. *Id.* at 251.[16]

While firearms generally remained lightly regulated, some states in the 1800s did begin
to crack down on other weapons considered "dangerous and unusual."  This category typically
consisted of Bowie knives, daggers, dirks, sword canes, brass knuckles, and in some
jurisdictions, certain small pistols.  These smaller and concealable weapons contrasted with
traditional, commonly owned weapons like rifles, muskets, sabers, bayonets, and larger
handguns.[17]

What set Bowie knives, dirks, and the like apart was their frequent use in criminal
assaults and perceived lack of lawful uses or defense value.  The first half of the nineteenth
century saw a spike in private violence, and newspapers regularly ran stories of "slight personal
offenses escalating into deadly conflicts."  Robert Leider, *Our Non-Originalist Right to Bear
Arms*, 89 Ind. L.J. 1587, 1602–06 (2014); *see also* Robert J. Spitzer, *Understanding Gun Law
History After* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 89 (2023)
(describing how Bowie knives were "widely used in fights and duels").  In one "nationally
infamous" incident, the speaker of the Arkansas House of Representatives came to blows with
another representative during a floor debate, and both men drew hidden Bowie knives.  Kopel
& Greenlee, *supra*, at 297–98, 305.  The member stabbed the speaker in the arm, and the speaker

---

[15]The statute made one exception, for "horseman's pistols."  *Nunn*, 1 Ga. at 246.  These pistols "were large
handguns" that came "with a double holster . . . meant to be draped over a saddle," and they were impracticable for
anyone not riding a horse.  Kopel & Greenlee, *supra*, at 288.

[16]The court invalidated the possession and open-carry prohibitions, while upholding the statute's ban on
concealed carry.  *Nunn*, 1 Ga. at 251.  Among the so-called "*Barron* contrarians," the *Nunn* court applied the Second
Amendment directly to Georgia.  *See id.* at 250; *see also Barron v. City of Baltimore*, 32 U.S. (7 Pet.) 243 (1833)
(holding the Bill of Rights inapplicable to the states), *superseded by constitutional amendment*, U.S. Const. amend.
XIV; Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 153–54 (1998).

Nearly two centuries later, *Heller* praised *Nunn* as "perfectly captur[ing]" the essence of the right to bear
arms.  554 U.S. at 612.

[17]Dangerous and unusual arms were usually impact weapons, not missile weapons.  With an impact
weapon, the user strikes an adversary while holding the weapon (think Bowie knives, daggers, clubs, brass knuckles,
but also commonly owned weapons like sabers).  Missile weapons, by contrast, fire a projectile at an adversary
(think rifles, muskets, bows, crossbows).

responded by stabbing the member in the chest, killing him. *Id.* at 297–98. (We can be grateful that Preston Brooks went after Charles Sumner in the United States Senate with a cane instead of a Bowie knife.)

Thanks to this and similar incidents, concealable weapons like Bowie knives, daggers, dirks, brass knuckles (and in some cases, certain pistols) became associated with assault, murder, dueling, robbery, and other criminal activity. *See* Leider, *supra*, at 1604–05 (explaining small size and concealability as prized features for their usefulness in surprise attacks). They weren't arms that law-abiding citizens typically owned for traditionally lawful purposes. So legislatures began regulating them more heavily, which often drew constitutional challenges. These antebellum and Reconstruction statutes—and the cases analyzing them—illustrate the contours of the "dangerous and unusual weapons" doctrine as it developed in the nineteenth century.

These laws and cases did two things. First, they distinguished between dangerous and unusual arms, and "weapons commonly used for lawful purposes." *Bianchi*, 111 F.4th at 503 (Richardson, J., dissenting). Historically, "dangerous" and "unusual" meant something like "particularly useful for criminal activity" and "not in common use for lawful purposes." *Id.* at 513. By contrast, protected weapons included "such arms as are commonly kept, according to the customs of the people, [which] are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State." *State v. Duke*, 42 Tex. 455, 458 (1875).[18]

Second, the laws and cases distinguished—at least for a while—between regulations and prohibitions, between public carry rules and possession bans. Statutes mostly regulated public carry of dangerous and unusual arms. Early on, they tended not to ban possession or sale outright. On that basis, courts tended to uphold them. Later in the nineteenth century, some states regulated these arms much more heavily, and at times, did ban sales or carriage altogether, approximating more modern possession bans.

---

[18]Some weapons may fall in between these categories. Crossbows, for example, might be unusual, but not dangerous, in the sense that they are particularly useful for criminal activity. *See Bianchi v. Brown*, 111 F.4th 438, 516 n.51 (4th Cir. 2024) (en banc) (Richardson, J., dissenting).

Let's walk through some examples.

In the 1840 case *Aymette v. State*, the Tennessee Supreme Court upheld a statute prohibiting the concealed carry of Bowie knives. 21 Tenn. (2 Hum.) at 155. Looking to history and noting that the state constitutional right to bear arms "was adopted in reference to [certain] historical facts," the court concluded that the right protected those arms commonly carried for traditional, lawful defense purposes, like "swords, muskets, rifles, etc." *Id.* at 157–61. That meant other weapons were out: "those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." *Id.* at 158. Such weapons, the court noted, "would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore secured by the constitution."[19] *Id.* So the legislature could regulate the carry of such weapons to protect the public from "desperadoes with concealed arms" going about "for purposes of private assassination." *Id.* at 159–60. The court rejected the view that the right to bear arms allowed every person "to arm himself in any manner he may choose, however unusual or dangerous the weapons he may employ." *Id.* at 156. Because the statute regulated Bowie knives, a weapon associated with criminal violence and not commonly carried for lawful purposes, the court upheld the challenger's conviction.

Or consider the Louisiana Supreme Court's decision in *State v. Smith*, 11 La. Ann. 633 (1856). The court upheld a law banning concealed carry of Bowie knives, dirks, pistols, and similar weapons. *Id.* at 634. The right to bear arms, the court found, did not extend to "the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists." *Id.*

---

[19]This case involved the Tennessee constitution. *Aymette*, 21 Tenn. (2 Hum.) at 156–58.

One other note. References to protected weapons as those useful for militia service or useful in war, whether in *Aymette* or in other cases, was one way to refer to the common-use test. As the Supreme Court has explained, "when called for service" in the militia, "men were expected to appear bearing arms supplied by themselves and of the kind *in common use at the time.*" *United States v. Miller*, 307 U.S. 174, 179 (1939) (emphasis added); *see also Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (mem.) (Thomas, J., dissenting from denial of certiorari) ("[The right's] scope is defined not by what the militia needs, but by what private citizens commonly possess."). Referring to a weapon as militia-grade signified that the weapon was in common use.

Similar examples abound in the antebellum period.  Weapons seen as implements of purely private violence and not commonly owned by the law-abiding were considered dangerous and unusual; states tended to ban concealed carry of such weapons, rather than the weapon itself; and courts tended to uphold such laws.  *See Nunn*, 1 Ga. at 246, 251 (upholding ban on concealed carry of Bowie knives, pistols, dirks, and other weapons); *Reid*, 1 Ala. at 614, 621–22 (upholding ban on concealed carry of Bowie knives, dirks, or firearms); *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833) (upholding ban on "wearing or carrying concealed weapons"); *State v. Buzzard*, 4 Ark. 18, 19 (1842) (opinion of Ringo, C.J.) (upholding ban on concealed carry of large knives, dirks, pistols, and sword canes); *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858) (upholding ban on concealed weapons); *but see Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 94 (Ky. 1822) (invalidating ban on concealed carry of pocket pistols, dirks, large knives, and sword canes).

After the Civil War, though, some states pushed things further.  Legislatures and courts continued to consider Bowie knives, dirks, and similar weapons "the greatest nuisances of our day."  *Hill v. State*, 53 Ga. 472, 474 (1874).[20]  And many jurisdictions kept on banning concealed carry (while some didn't regulate at all).  *E.g.*, *State v. Wilforth*, 74 Mo. 528, 531 (1881) (upholding concealed-carry ban); *Commonwealth v. Murphy*, 44 N.E. 138, 138 (Mass. 1896) (noting "it has been almost universally held that the legislature may regulate and limit the mode of carrying arms").  But others tightened their regulatory grip.  Though not without constitutional controversy, these stricter laws often survived judicial review.

In 1870, the Tennessee legislature banned anyone from "publicly or privately" carrying a revolver, pocket pistol, dirk, sword cane, or Spanish stiletto.  *Andrews*, 50 Tenn. (3 Heisk.) at 171.  This statute came closer to a ban on possession than a carriage regulation.  When hearing a challenge to the statute, the court echoed the familiar refrain and described how the right to bear arms protected such arms "as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties,

---

[20]*See also State v. Workman*, 14 S.E. 9, 10 (W. Va. 1891) (noting that the legislature had directed "that when a man is found going around with a revolver, razor, billy [club], or brass knuckles upon his person, he shall be presumed to be a burglar, duelist, gambler, thief, or other criminal of the like violent and dangerous class")

as well as of the State." *Id.* at 179.  And what could you do with such arms?  The right permitted you to use them "in all the usual modes to which they are adapted, and common to the country." *Id.*

The court quashed the defendant's indictment.  The state had indicted him under the revolver provision without making clear what kind of revolver he'd possessed.  *Id.* at 186–87. And the statute was unconstitutional as applied to some kinds of revolvers, the court found, because some revolvers were part of the soldier's equipment, and thus commonly carried for lawful public defense purposes.  *Id.*  But the court upheld the statute as to dirks, sword canes, Spanish stilettos, and pistols because (like the Bowie knives in the court's *Aymette* decision) these weapons were closely associated with criminal activity and not commonly carried for lawful purposes.  *Id.* at 186.  So while the court allowed a stricter method of regulation, it maintained the traditional distinction between lawful arms and dangerous or unusual arms.

A few years later, Arkansas passed a law prohibiting the public carry of pistols, Bowie knives, sword canes, and brass knuckles, without distinguishing between open or concealed carry.  *Fife v. State*, 31 Ark. 455, 456 (1876).  The act did permit you to have such weapons "on [your] own premises."  *Id.*  The state supreme court upheld the statute against the defendant's challenge because the pistol the defendant had carried was "such as is usually carried in the pocket, or of a size to be concealed about the person, and used in private quarrels and brawls, and not such as is in ordinary use, and effective as a weapon of war, and useful and necessary for the 'common defence.'"  *Id.* at 461.  So again, the court permitted a stricter means of regulating dangerous and unusual weapons, while keeping the traditional understanding of what constituted dangerous and unusual weapons.

A similar dynamic played out in Texas.  In *English v. State*, the state supreme court upheld a law banning open and concealed carry of pistols, Bowie knives, dirks, daggers, and brass knuckles.  35 Tex. 473, 480–81 (1871); *see also* Kopel & Greenlee, *supra*, at 315.

Taking a strong militia-centric view of the right to bear arms, the court held that the right protected only such arms "as are used for purposes of war." 35 Tex. at 475.[21]

But just a few years later, in *State v. Duke*, the court broadened its view and rejected *English*'s position "that the word 'arms,' . . . refers only to the arms of a militiaman or soldier." 42 Tex. 455, 458 (1875). "The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation)," the court explained, "must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State." *Id.*; *accord Nunn*, 1 Ga. at 251 ("The right of the whole people . . . and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed* . . . ."). That meant some pistols regulated by the statute would receive constitutional protection. *Duke*, 42 Tex. at 459. The court then revisited the state's amended law and found that it did not infringe the right to keep and bear these pistols, since the law made exceptions for carrying them in self-defense or keeping them at home. *Id.* at 456, 458–59.

Which weapons counted as dangerous and unusual could vary across jurisdictions. The Texas Supreme Court, for example, at one point found Bowie knives "in common use" and convenient for individual self-defense, reasoning that "the gun or pistol may miss its aim." *Cockrum v. State*, 24 Tex. 394, 402–03 (1859). The state had a special history with Bowie knives; they'd been carried by Texans in the war for independence against Mexico, and the knives were thus "omnipresent" in the middle of the century. Kopel & Greenlee, *supra*, at 314. So even though the Bowie knife was a "deadly" and "exceeding[ly] destructive" weapon, it wasn't unusual. *Cockrum*, 24 Tex. at 402–03. Thus, the "right to carry a bowie-knife for lawful

---

[21]The court partially stuck with the traditional view that "deadly weapons," "the wicked devices of modern craft" which were "employed in quarrels and broils, and fights between maddened individuals," fell outside the scope of the right to bear arms. 35 Tex. at 474–75.

defense [was] secured." *Id.* at 402.[22]  But while applications may have differed in different states, the test remained the same.[23]

As this example illustrates, a weapon could be both particularly dangerous but also in common use for lawful purposes.  If so, the weapon warranted constitutional protection.  "The fact that a weapon was especially harmful was necessary but not sufficient to limit its possession or carry."  *Bianchi*, 111 F.4th at 532 (Richardson, J., dissenting); *see also Aymette*, 21 Tenn. (2 Hum.) at 158 (discussing weapons "*only* in the hands of the robber and the assassin" (emphasis added)); *Smith*, 11 La. Ann. at 633 (weapons "most frequently" in criminal hands); *Fife*, 31 Ark. at 461 (weapons "used in private quarrels and brawls, and not such as [are] in ordinary use").

If a weapon was in common use for lawful purposes but also sometimes used for criminal purposes, its common-use status trumped its criminal-use status.  In that case, legislatures simply had to target the criminal *abuse* of such weapons, not the weapons themselves.  *See Wilson v. State*, 33 Ark. 557, 560 (1878) ("If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and the gallows, and not by a general deprivation of a constitutional privilege.").

Over the nineteenth century, a few states did pass laws banning sale, carry, or use of Bowie knives or other weapons, but such laws were rare.  *See* Kopel & Greenlee, *supra*, at 293. Nine jurisdictions banned the sales of "slungshots," a type of rope club, which was the most for any weapon.  *Id.* at 347.  Near the end of the century, two states (effectively) banned some firearms considered dangerous and unusual.  *See id.* at 226, 288–89.  Tennessee made it criminal to sell any handgun or bring one into the state, while Arkansas did the same for handguns (save army and navy pistols), Bowie knives, sword canes, or brass knuckles.  The courts upheld these

---

[22]Elsewhere, the Northeastern states apparently had little interest in regulating Bowie knives.  *See* Kopel & Greenlee, *supra*, at 312.

[23]Weapons can also move in and out of categories over time, as well as across jurisdictions.  Handguns provide an excellent example.  "Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today."  *Bruen*, 597 U.S. at 47.

laws. *See State v. Burgoyne*, 75 Tenn. 173, 173–76 (1881); *Dabbs v. State*, 39 Ark. 353, 355–57 (1882).

That brings us to the turn of the century. I'll leave off there because twentieth-century historical material generally offers little insight into the original understanding of the Second Amendment. *Bruen*, 597 U.S. at 66 n.28.

## C.

So what can we make of this history and tradition? I see several potential lessons for the federal machinegun ban, some more clear and some less so. Though we need not answer every question today, I can at least sketch out the battle lines.

## 1.

Some of the history poses a problem for the government. For starters, the absence of Founding-era and early-republic bans on dangerous and unusual weapons makes it harder for the government to justify § 922(o). The one antebellum statutory ban on firearm possession was held unconstitutional in *Nunn*. So there's a nonfrivolous question whether the "dangerous and unusual weapons" doctrine is a doctrine about *what* weapons you can own in the first place, or instead a doctrine about *how* you can carry or use certain weapons (that are lawfully owned).

Some early courts seemed to think that legislatures had no power to completely ban any kind of weapon, including dangerous and unusual ones. *See Simpson v. State*, 13 Tenn. (5 Yer.) 356, 360 (1833) ("[A]n express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature . . . ."); *Andrews*, 50 Tenn. (3 Heisk.) at 193–201 (opinion of Nelson, J.) (similar); *Nunn*, 1 Ga. at 251 (similar). Other courts disagreed. *See Aymette*, 21 Tenn. (2 Hum.) at 161 (disagreeing with *Simpson*); *Andrews*, 50 Tenn. (3 Heisk.) at 171; *Dabbs*, 39 Ark. at 355–57; *Burgoyne*, 75 Tenn. at 173–75. These latter opinions tended to come later in the nineteenth century, though. And the farther we get from ratification in 1791, the less probative history

becomes.  *See Bruen*, 597 U.S. at 34–37.[24]  Plus, some states that effectively banned possession still carved out exceptions for self-defense or keeping the weapon at home.  *See*, *e.g.*, *Fife*, 31 Ark. at 456 (home); *State v. Workman*, 14 S.E. 9, 9 (1891) (self-defense).

As for machineguns specifically, until 1986 they were lawfully owned by anyone who could purchase one.  And don't forget—machineguns are still lawfully owned by some private citizens *today*.  The statute grandfathers in automatic firearms owned before the ban took effect. 18 U.S.C. § 922(o)(2)(B).

In fact, the 1986 machinegun ban was the first time the federal government ever enacted a nationwide ban on any kind of weapon.  *See* Stephen Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons" to Tax*, 25 Wyo. L. Rev. 149, 164 (2025).  That's nearly 200 years from the Second Amendment's ratification.

**2.**

But the history poses some serious problems for criminal-defendant challengers, too. Arguments from historical silence are rarely satisfying; it's possible that legislatures had the ability to ban possession of certain weapons all along, even if they didn't exercise the full extent of their power early on.  Originalism does not impose a "'use it or lose it' view of legislative authority," nor does it require us to assume "that founding-era legislatures maximally exercised their power to regulate."  *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring).  Or perhaps dangerous and unusual weapons don't just receive *less* constitutional protection on a sliding scale; perhaps they receive *no* constitutional protection, just like trebuchets or eggplants, so the fact that governments chose not to regulate open carry or home possession is immaterial.

For those who take a generous view of "liquidation" theory, perhaps the early, anti-ban cases aren't enough to settle these questions.  The early 1800s saw only a handful of state-court adjudications of weapon regulations, and it may have taken several more decades to hash out and

---

[24]Many Second Amendment cases involve state regulation, and courts have not yet settled on whether the relevant ratification period is 1791, when the Second Amendment was ratified, or 1868, when the Fourteenth Amendment was ratified.  *See Bruen*, 597 U.S. at 37–38.  This case involves a federal statute, though, so 1791 is our target date.

settle questions of possession bans.[25]  *Cf. Bruen*, 597 U.S. at 35–36; *Rahimi*, 602 U.S. at 723–729 (Kavanaugh, J., concurring); *see generally* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019).  If we give weight to cases from the 1840s (five decades postdating the Second Amendment), what's another three decades into the 1870s?  I recognize that we have to stop somewhere, but drawing that line isn't easy.  As for the statutory carveouts for possession at home, they seem more like a matter of legislative grace than a constitutional requirement.

And as always, we can't cling *too* closely to the precise forms that laws took long ago.  We need a historical analog, but we don't need a "historical twin" or "dead ringer."  *Bruen*, 597 U.S. at 30 (emphasis omitted).  Perhaps the fact that nearly all old laws banned concealed carry signifies only a contingent assessment about the effectiveness of carriage restrictions at suppressing crime.  Perhaps once a weapon is deemed dangerous and unusual, legislatures may regulate its whereabouts in whatever way necessary to minimize the harm the weapon can cause. *See Bianchi*, 111 F.4th at 483 ("[H]istory and tradition support the *banning* of weapons that are both dangerous *and* unusual . . . .") (Richardson, J., dissenting) (first emphasis added).  After all, "[w]e are bound by the principles undergirding the Second Amendment, but we are not bound by the regulators' contingent empirical judgments about how best to effectuate those principles, which are not part of the right as the ratifiers would have understood it."  Alicea, *supra* (manuscript at 40).

If possession bans are constitutional, what about machineguns specifically?  Are they dangerous and unusual?  As it turns out, there's significant historical evidence closely tying the machinegun to criminal activity, especially organized criminal activity, and demonstrating a lack of ordinary, law-abiding interest.

---

[25]As discussed, some cases favored bans while other cases rejected them.  The mere fact of disagreement by itself shouldn't cause us to throw our hands up; there are better and worse arguments and answers to legal questions.  But if you take the view that the 1800s cases did not definitively settle the question of possession bans, and the matter is unclear, perhaps we owe legislatures some deference.  After all, judicial deference to legislatures on truly doubtful questions is part of our historical regulatory tradition, too.  *See* Derek A. Webb, *The Lost History of Judicial Restraint*, 100 Notre Dame L. Rev. 289 (2024); William Baude, *Fear of Balancing*, 2024 Sup. Ct. Rev. 169, 181; *e.g.*, *Bliss*, 12 Ky. (2 Litt.) at 94 ("Whether or not an act of the legislature conflicts with the constitution is, at all times, a question of great delicacy . . . .  The court should never, on slight implication or vague conjecture, pronounce the legislature to have transcended its authority," but can declare a law unconstitutional "when a clear and strong conviction is entertained . . . .").

The automatic machinegun came around in the late 1800s and early 1900s. In 1920, the Thompson submachinegun became the first automatic firearm marketed to American consumers. *See* Kopel & Greenlee, *supra*, at 287 n.490. "In the consumer market, it was a failure. The gun was popular with criminals, especially bootleggers, and had some sales to law enforcement." *Id.* (citing John Ellis, *The Social History of the Machine Gun* (1986)); *see also* Kopel, *supra*, at 85 & n.240, 89 (describing how twentieth-century gangsters used machineguns). Stories of gangster machinegun violence permeated newspapers of the early twentieth century. *See* Spitzer, *supra*, at 63. One paper described how the Tommy gun had become "inseparable from gang fights, bank robberies, assassinations and other major crimes." *Id.* at 64 (internal quotation marks omitted).

Many states responded by enacting anti-machinegun laws in the 1920s and 1930s. *Id.* at 64–65 & n.38. And in 1932, Congress banned the possession of machineguns in the District of Columbia, along with other weapons traditionally treated as dangerous and unusual. *See* Act of July 8, 1932, ch. 465, §§ 1, 14, 47 Stat. 650, 650, 654 (machineguns, sawed-off shotguns, metal knuckles, blackjacks, clubs, and others). Congress likely couldn't have passed a national ban at the time, since the most expansive notions of the interstate commerce power—§ 922(o)'s basis— came later. *See Wickard v. Filburn*, 317 U.S. 111, 127–29 (1942).[26] But in the District of Columbia, Congress acted just like a state exercising traditional police powers to eliminate the weapons of gangsters and assassins. And it acted early on, responding to a serious social problem within a few years.

Eventually, machineguns became a standard military firearm. But it's not clear whether or how many ordinary Americans would have possessed them for lawful purposes throughout the twentieth century.[27] It very well may be that machineguns would have fit the traditional understanding of dangerous and unusual—particularly useful for illegal activity and not commonly possessed by law-abiding citizens.

---

[26]Indeed, under a more originalist view of Congress's commerce powers, the federal machinegun ban might be more susceptible to a Commerce Clause challenge than a Second Amendment challenge. *See United States v. Rybar*, 103 F.3d 273, 286–87 (3d Cir. 1996) (Alito, J., dissenting).

[27]The government's brief represents that a decade ago, there were about 170,000 legacied machineguns lawfully owned by private citizens. Appellee Br. at 31–32.

Even assuming that some traditional machineguns could receive constitutional protection, the Glock switch that Bridges carried seems like a pretty good candidate for exclusion. A Glock switch is a small metal device that converts a Glock semiautomatic pistol to an automatic pistol by disabling the trigger bar. *See* Kopel, *supra*, at 53. In recent years, criminal syndicates in China have been manufacturing them and illegally exporting them to the United States where they find their way into criminal hands. *Id.* These devices are a menace. Like the dirks and daggers of days past, the Glock switch is tiny, easily concealable, easily transportable, and often used to commit horrific private violence—gang shootings, random shootings. By all accounts the Glock switch seems like the weapon of modern-day "desperadoes," "efficient only in the hands of the robber and the assassin" and "usually employed in private broils." *Aymette*, 21 Tenn. (2 Hum.) at 158–59. Or in other words, not "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

Bridges himself is Exhibit A. He drove down a Memphis highway shooting at police cars with his Glock-switch-modified pistol. He hit one car, narrowly missing an officer, and then led the police on a high-speed chase that lasted for ten miles and only ended when he crashed into a concrete barrier. Not exactly a sympathetic defendant. It's beyond dispute that Bridges's conduct falls within the ambit of *some* historical regulatory tradition. Indeed, his conduct seems like a classic common-law going-armed violation—he waved a deadly weapon out a car window on a busy highway and breached the peace, terrorizing the public and law enforcement alike. (That's before we even get to basic crimes like assault or attempted murder.)

But 18 U.S.C. § 922(o) doesn't codify the common-law offense of going armed *in terrorem populi*. It criminalizes the possession of a specific weapon, not the misuse of all deadly weapons. I think the government must do more work tackling these historical questions and connecting history and tradition to modern law. I've explained already that a facial analysis and plain-error review suffice to resolve today's case. But in the future, I hope that when the

government wants a statute upheld, the government will tell a more compelling story about a statute's consistency with the past.[28]

**3.**

There are two other odd features of the "dangerous and unusual weapons" doctrine that, in my view, the government doesn't adequately grapple with. First, the objection that some courts and litigants raise to the supposedly circular relationship between a weapon's unusualness and its eligibility to be banned. Second, the idiosyncrasy that at common law, interpreters described the doctrine in multiple ways—sometimes "dangerous *and* unusual weapons," but sometimes "dangerous *or* unusual weapons."

Circularity first. Why do we say that a ban on a certain weapon is justified by that weapon's unusualness, when the weapon may only be unusual because it's already been banned? Is unusualness the cause or the effect of the law? The Seventh Circuit explains things this way:

> [R]elying on how common a weapon is at the time of litigation [is] circular . . . . Machine guns aren't commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity.

*Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015).[29] The Seventh Circuit used this argument to distance itself from the common-use test and *uphold* a ban on semiautomatics; Bridges raises a version of it to argue for *striking down* the machinegun ban.

This objection has some intuitive appeal, but returning to the historical sources helps explain the oddity. The circularity arises only when considering *bans* on unusual weapons. Yet at English and American common law, and for half a century after the Founding, no one *banned*

---

[28]So I'd leave open the possibility that some defendant someday could bring an "as-applied" challenge to a § 922(o) prosecution for possessing a prohibited firearm. I'd leave the "matter to be settled by evidence as to what character of weapon" the defendant possesses. *Andrews*, 50 Tenn. (3 Heisk.) at 186.

[29]*See also Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 50 (1st Cir. 2024) ("It defies reason to say that legislatures can only ban a weapon if they ban it at (or around) the time of its introduction, before its danger becomes manifest."); *Bianchi*, 111 F.4th at 460–61 (similar).

dangerous and unusual weapons; the law simply regulated methods of public carry. And carriage regulations don't pose a feedback-loop problem on the same scale.

The "unusual" doctrine wasn't originally developed or designed to fit with prohibitions on possession. Forcing it to fit is a little like mixing oil and water. It is we moderns who have assumed, sometimes too quickly, that banning dangerous and unusual weapons has always been constitutional. The circularity is a quirk of our creation, not the historical doctrine's.[30]

Next, consider "and" versus "or." We generally think of the doctrine, as *Heller* described, as concerning "dangerous *and* unusual weapons." But recall that Blackstone—*Heller*'s leading citation—wrote about "dangerous *or* unusual weapons." 5 Blackstone, *supra*, at 148 (emphasis added). In fact, if we open up *Heller*'s string cite of authority, the sources seem to alternate between "*and*" and "*or*" without second thought, as if they were interchangeable. *Compare id.*, *and O'Neill*, 16 Ala. at 67 ("deadly or unusual weapons"), *and* Henry J. Stephen, *Summary of the Criminal Law* 85 (1834) ("dangerous or unusual Weapons"), *with* Wilson, *Of Crimes Against the Right of Individuals to Personal Safety*, *supra*, at 1138 ("dangerous and unusual weapons"); *Langford*, 10 N.C. (3 Hawks) at 383 ("dangerous and unusual weapons"); Francis Wharton, *A Treatise on the Criminal Law of the United States* 527 (1846) ("dangerous and unusual weapons").[31]

At times, the law didn't even use both terms. You can find references instead to "dangerous weapons" or "unusual weapons." *See Smith*, 11 La. Ann. at 634 ("dangerous weapon"); *Huntly*, 25 N.C. (3 Ired.) at 422 ("unusual weapon"); *Nunn*, 1 Ga. at 246 ("deadly

---

[30]Putting aside whether "unusual" weapons can be banned, there is no problem with the position that common weapons cannot be banned. The Second Amendment protects a *customary* historical right, based in the practice of the people. "Both the traditional English constitution and American constitutions were grounded in customary law," and as scholars have explained, "'[C]ustom obtain[ed] the force of law by a combination of time and precedent. Whatever had been done from time immemorial in a community was legal; whatever had been abstained from was illegal.'" William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1494 (2024) (quoting John Phillip Reid, *In Defiance of the Law: The Standing-Army Controversy, the Two Constitutions, and the Coming of the American Revolution* 160 (1981)).

[31]*See also* John A. Dunlap, *The New-York Justice* 8 (1815) ("and"); 1 Russell, *supra*, at 271 ("and"); Ellis Lewis, *An Abridgement of the Criminal Law of the United States* 64 (1847) ("and"); Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ("or"); *English*, 35 Tex. at 476 ("or"); *State v. Lanier*, 71 N.C. 288, 289 (1874) ("or").

weapons"). These terms seemed to work as stand-ins or synonyms for the more complete "dangerous and unusual."

What do we make of these quirks? Perhaps there are other ways to conceptualize what "dangerous and unusual" means. Perhaps the phrase could be understood more loosely, as a legal or linguistic term of art, not a strict two-part conjunctive test. Perhaps the term represents some sort of quasi-hendiadys, a figure of speech, with "dangerous" and "unusual" working together to form a single, complex idea. *Cf.* Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688–89, 695–701 (2016).[32] That way, the conjunction would matter less; "dangerous" and "unusual" could be joined by "*and*" or "*or*" without altering the meaning.[33] As one, blended idea, "dangerous and/or unusual weapons" could perhaps signify weapons that are *dangerous in their unusualness*, or *unusual in their dangerousness*.

This reading could make some sense of the historical sources' alternating conjunctions as if the difference didn't matter. It could offer another understanding of what "dangerous" means. (Aren't all weapons definitionally dangerous? But *unusually dangerous* sets certain weapons apart.) Or it could make sense of the supposed circularity in defining weapons that can be banned as those that are unusual for already being banned. (Mere unusualness doesn't suffice; the weapons must be *dangerously unusual*.)[34]

Whether the historical sources understood "dangerous and unusual weapons" this way, I leave for another day. This case does not require resolving these possibilities. But in future cases, rationalizing the "and" versus "or" distinction may help us better understand the nuances that shaped this historical doctrine.

---

[32]Professor Bray offers the example of calling a cow "nice and fat." We don't take the "and" literally; the cow isn't nice and, separately, fat. The cow is something like "nicely fat."

[33]The phrase came from the common law, after all, not any statute. And we do not interpret common-law terms as if they came from written law.

[34]I imagine that these different conceptualizations could land in a similar spot as the traditional view that "dangerous and unusual" meant not commonly owned for lawful purposes and specially adapted to criminal activity. These criminally adapted weapons are *unusually dangerous* or *dangerously unusual* in that only criminals tend to have them, making them less of a known quantity to the public and police.

**D.**

I do agree with the majority on one important point. Analysis of the "dangerous and unusual weapons" doctrine falls under *Bruen*'s Step 2, where it's the government's burden to show that a firearms ban comports with history and tradition. *See* Maj. Op. at 9–11.

As *Bruen* structured the test, we first ask if the Second Amendment's plain text covers an individual's conduct. *Bruen*, 597 U.S. at 17. This stage could involve asking if something constitutes an "*arm*" (eggplants are out) or if you can "*bear*" it (tanks are out). If the text covers it, "the Constitution presumptively protects that conduct." *Id.* Then, at the next stage, the burden rests on the government to "demonstrate that [a] regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* We sometimes term the textual inquiry "*Bruen* Step 1," and the history-and-tradition inquiry about the scope of the right "*Bruen* Step 2."

Analysis of the "dangerous and unusual weapons" doctrine belongs at Step 2, where the burden belongs to the government. The doctrine speaks to the scope of the right, as historically understood. It does not say that dangerous and unusual arms are not arms.

Still, some courts have concluded otherwise. They have ruled at Step 1 that the history of "dangerous and unusual weapons" means that such weapons aren't even "arms" within the Second Amendment's meaning. *See Bianchi*, 111 F.4th at 447–48; *Bevis v. City of Naperville*, 85 F.4th 1175, 1192–96 (7th Cir. 2023). This analysis does not faithfully implement *Bruen*'s instructions. Step 1 concerns the *semantic content* of the Second Amendment's *text*. It's about what triggers the right at all. Step 2 concerns the *historical scope* of the right, once we know what implicates the right.

To be sure, perhaps we may need some "minimal historical context" to understand the text's semantic meaning. Alicea, *supra* (manuscript at 10). We consult eighteenth-century dictionaries, for example, not modern ones, to uncover the constitutional definition of "arms." *See Heller*, 554 U.S. at 581–84. But Step 1 is primarily a linguistic enterprise, not a historical one. History and tradition determine the scope of the right at Step 2.

Dangerous and unusual weapons are plainly "arms" that trigger Second Amendment scrutiny. Bowie knives and (*arguendo*) machineguns are "[w]eapons of offence," "thing[s] that a man . . . takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (internal quotation marks omitted). So they pass Step 1. Now, Congress might be able to specially regulate (or ban) them based on history and tradition, but we determine that point—the right's scope—at Step 2. And just because we regulate (or ban) certain arms doesn't mean that they aren't arms to begin with. They're "unprotected not because they aren't 'Arms' under the plain text, but because they fall within the historical tradition of regulating dangerous and unusual weapons." *Bianchi*, 111 F.4th at 496 (Richardson, J., dissenting). And "[t]he nature of an object does not change based on its popularity," even if "the regulation of that object can." *Bevis*, 85 F.4th at 1209 (Brennan, J., dissenting).

Where we slot in the dangerous-and-unusual analysis makes a difference because the government bears the burden at Step 2, where much of the action happens, but not at Step 1. Courts that slot this analysis into Step 1 improperly relieve the government of that burden. I am pleased to join the majority in keeping the historical analysis where it belongs.

### E.

Stepping back for a minute, why does this history matter so much? Relatively speaking, machineguns are small fry in the current Second Amendment legal landscape.

It matters because your theory of "dangerous and unusual weapons" doesn't just dictate whether the government can ban machineguns. It dictates how you approach bans on many other arms. Semiautomatics, for example, like the AR-15—"the most popular rifle in the country." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556, 1569 (2025); *see also Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (mem.) (Kavanaugh, J., statement respecting denial of certiorari) ("Americans today possess an estimated 20 to 30 million AR-15s. And AR-15s are legal in 41 of the 50 states . . . ."). Even though semiautomatics are "commonly available" in many states, *Garland v. Cargill*, 602 U.S. 406, 430 (2024) (Sotomayor, J., dissenting), which should shield them under the common-use test, a few jurisdictions have banned them and the courts of appeals have so far stood aside. *E.g.*, *Bianchi*, 111 F.4th at 441

(upholding Maryland ban); *Bevis*, 85 F.4th at 1181–82 (upholding Illinois ban); *Capen v. Campbell*, 134 F.4th 660, 663 (1st Cir. 2025) (upholding Massachusetts ban).  Other examples of controversial arms abound.  *See, e.g.*, *Caetano*, 577 U.S. at 411 (stun guns); *Teter v. Lopez*, 76 F.4th 938, 942 (9th Cir. 2023), *vacated and remanded as moot*, 125 F.4th 1301 (2025) (en banc) (butterfly knives); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 50–51 (1st Cir. 2024) (large capacity magazines).

If a case like this comes before us again, I hope that we and the parties and will give the history and tradition the attention it requires—and deserves.

## III.

Last, I'd like to address the *Hamblen* case.  In 2009, just after *Heller*, this court decided *Hamblen v. United States* and ruled that a challenge to § 922(o) "[was] directly foreclosed" by *Heller*.  591 F.3d at 474.  The analysis consisted of all of three sentences:

> *Heller* [instructed] that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."  Moreover, the *Heller* Court expressly rejected Hamblen's reading of *United States v. Miller*, 307 U.S. 174 (1939), when it opined that it would be a "startling" interpretation of precedent to suggest that restrictions on machine guns, set forth in the National Firearms Act, might be unconstitutional.  Thus, whatever the individual right to keep and bear arms might entail, it does not authorize an unlicensed individual to possess unregistered machine guns for personal use.

*Id.* (citations omitted).  That's it.  The question today is whether *Hamblen* remains binding precedent that disposes of any § 922(o) challenge.

It does not.  Simply put, *Bruen* demands more.

## A.

*Bruen* directs courts to do two things:  Engage in historical analysis and abstain from policy balancing.  In other words, *Bruen* gives both an affirmative and negative command.  *Hamblen* may have abstained from balancing, but it did not analyze or engage with the history of dangerous and unusual weapons or machineguns.

*Hamblen* cited dicta from *Heller* about machineguns and the National Firearms Act.  But the National Firearms Act is a different statute than the machinegun ban.  Congress passed the National Firearms Act in the '30s under its taxing power.  *See* National Firearms Act of 1934, ch. 757, §§ 3–5, 48 Stat. 1236, 1237–38.  The statute created registration requirements for privately owned machineguns and imposed a tax on any transfer or sale of a machinegun.  The statute did not ban machineguns.  Congress banned them in a different, later statute, in a 1986 amendment to the Gun Control Act of 1968, a criminal law passed under the interstate commerce power.  *See* Act of May 19, 1986, § 102, 100 Stat. 449, 453.  So it's unsurprising that *Heller* thought that the National Firearms Act was constitutional—that law only *regulated* machineguns, it didn't *ban* them.  But whatever *Heller* thought of registration and taxing rules tells us little about whether Congress can prohibit possession entirely.  And more importantly, this is not the stuff of which *Bruen* analysis is made.

The majority also reads *Hamblen* to have also incorporated *Heller*'s dicta about dangerous and unusual weapons.  Maj. Op. at 8.  But that's still not enough to survive *Bruen*.  For one, the dicta was just that.  Important dicta, to be sure, but still dicta.  You can think of *Heller*'s string cite to Blackstone, James Wilson, and a few treatises as a helpful suggestion, a starting point for additional research.  But as I've explained, there's a lot more work that needs to be done to connect the dots between a tradition of regulating the *carry* of dangerous and unusual weapons and a ban on *possession* of such weapons.  Even *Heller*—as scholarly as it was—was imprecise with the distinction.  *See* Baude & Leider, *supra*, at 1485; Leider, *supra*, at 1595.

This is exactly why courts treat holdings as holdings and dicta as dicta.  The *Heller* Court didn't have to exhaustively consider the history of dangerous and unusual arms because that wasn't part of the question before the Court.  As Chief Justice Marshall once explained, "[t]he question actually before the Court is investigated with care, and considered in its full extent."  *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821).  Judges often "think differently—more carefully, more focused, more likely to think things through—when our words bring real consequences to the parties."  *United States v. Burris*, 912 F.3d 386, 410 (6th Cir. 2019) (en banc) (Kethledge, J., concurring in judgment).  But judges don't think through dicta with the same care.  We thus don't give dicta the same weight as holdings.

And, funny enough, treating dicta as dicta turns out to be part of our nation's historical tradition of adjudicating arms-regulation cases, too.  *See Aymette*, 21 Tenn. (2 Hum.) at 161 (rejecting an earlier case's remark because "in that case no question as to the meaning of [that] provision in the constitution arose, or was decided by the court, and the expression is only an incidental remark of the judge who delivered the opinion, and, therefore, is entitled to no weight").  One could take the same attitude toward *Heller*.

True, this court has sometimes chosen to treat Supreme Court dicta as binding.  *See* Maj. Op. at 7–8 (citing *Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019)).  Fair enough. But that only works when there's no intervening Supreme Court decision.  *Bruen* is an intervening decision.  *Bruen* didn't reverse anything in *Heller*, but it *developed* and *clarified* for the lower courts the method that Second Amendment cases must follow—and which *Hamblen* did not follow.  *Bruen* says to show your work.  *Hamblen* copied someone's else answers.

Indeed, *Heller* itself was crystal clear about the limits of its own dicta.  The Court cautioned that it did not need to go into any historical depth on dangerous and unusual weapons (or other Second Amendment limits) because "there [would] be time enough to expound upon the historical justifications" for those limits "if and when those exceptions come before" courts. 554 U.S. at 635.  *Bruen* and *Rahimi* both reiterated this admonition.  *Bruen*, 597 U.S. at 31; *Rahimi*, 602 U.S. at 702.  The lesson is clear:  When we, as lower courts, encounter those issues in a case that presents them, we must go and do the historical spadework ourselves.[35]  We can't stand on offhand remarks from the Court.  Taking *Heller*'s dicta as gospel would violate that dicta's explicit warning label.[36]

---

[35]Or, at least, the government must do the historical spadework to carry its burden at Step 2.

[36]For similar reasons, I give some weight, but not dispositive weight, to *Heller*'s oft-miscited statement about M-16 machineguns.  After making one reference to the carrying of dangerous and unusual arms, *Heller* transitioned to a thought experiment about machineguns:  "It may be objected that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause." *Heller*, 554 U.S. at 627.  (The Court rejected the objection.)

This statement, carefully phrased in the hypothetical, did not actually state that machineguns may be banned.  I see no point in overclaiming that it did.  Now, I'm not oblivious to the fact that *Heller* (or, at least, some Justices in the majority) may have been suggesting that an M-16 ban is fine.  But as I've described here, and below, we don't take *Heller*'s dicta as gospel.  And the history, once we consult it, may be more complicated than *Heller* let on.  So I read this passage from *Heller* as studiously and strategically ambiguous—and thus mostly silent—on the

The story of *Heller* to *Hamblen* to this case illustrates the "progressive distortion" of how "a hint becomes a suggestion, is loosely turned into dictum and finally elevated to a decision." *United States v. Rabinowitz*, 339 U.S. 56, 75 (1950) (Frankfurter, J., dissenting)). When you pierce through the layers, no court has actually examined the question; it's "turtles all the way down." *Rapanos v. United States*, 547 U.S. 715, 754 (2006) (plurality) (internal quotation marks omitted). In my view, that's not how judging should work.

*Bruen* demands historical analysis of the question before the court. *Hamblen* did not do that for § 922(o), and it relied on casual remarks in a case that didn't have § 922(o) before it. Therefore, *Bruen* abrogated *Hamblen* and we must analyze § 922(o) anew. I concur in the majority's decision to perform a fresh Second Amendment analysis, but I cannot join the majority's additional assertion that *Hamblen* lives on. I worry that the majority's approach, if adopted elsewhere, would drain some of the rigor from *Bruen*'s instructions.

### B.

The foregoing isn't just my reading of *Bruen*'s teaching. It's exactly how our own circuit has already read *Bruen*. Just look at two of our recent cases. One case found that our old precedent had analyzed history and tradition and thus remained binding. The other case found that our old precedent had not analyzed history and tradition, and thus did not remain binding.

Earlier this year, we considered sentencing enhancements for using a weapon while committing a crime in *United States v. Risner*, 129 F.4th 361 (6th Cir. 2025). We found that our pre-*Bruen* decision in *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012), upholding the enhancements, survived *Bruen*. *See Risner*, 129 F.4th at 366–69. We relied on *Greeno* and saw no need to reexamine any history because *Greeno* had already conducted a historical analysis. *Greeno* had "started and ended [its] analysis with the inquiry later embraced by *Bruen*." *Id.* at 367. We made this point painstakingly clear. Describing *Greeno*, we wrote: "We began our historical survey at common law . . . . We then moved to the laws of the states in the eighteenth and nineteenth centuries, many of which included increased penalties for using a weapon during

---

question of whether military-grade machineguns may be banned. Even if the decision *suggested* that a ban is fine, *Bruen* makes clear that courts—and the government—still have to *prove* it when a case presents the question.

the commission of a crime." *Id.* at 368 (cleaned up). That all meant *Greeno* had done enough to keep its job as binding precedent. So all we had to do in *Risner* was apply *Greeno*.

Contrast that situation with *United States v. Williams*. 113 F.4th 637. *Williams* addressed the statute banning felons from owning firearms. *Id.* at 642. Again, we had pre-*Bruen* precedent upholding the statute. *See id.* at 645 (citing *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010)). So again, we asked whether our pre-*Bruen* precedent remained good law. This time, we found that it did not. Why? Because the old caselaw had not performed a history-and-tradition analysis. *Id.* We explained at length:

> [O]ur pre-*Bruen* precedent isn't binding here because intervening Supreme Court precedent demands a different mode of analysis. . . . And while *Bruen* didn't overrule any aspect of *Heller*, it set forth a new analytical framework for courts to address Second Amendment challenges. Under *Bruen*, courts must consider whether a law's burden on an individual's Second Amendment rights is "consistent with the principles that underpin our regulatory tradition." . . . .
>
> Our circuit's pre-*Bruen* decisions on § 922(g)(1) omitted any historical analysis. They simply relied on *Heller*'s one-off reference to felon-in-possession statutes. Those precedents are therefore inconsistent with *Bruen*'s mandate to consult historical analogs. Indeed, applying *Heller*'s dicta uncritically would be at odds with *Heller* itself, which stated courts would need to "expound upon the historical justifications" for firearm-possession restrictions when the need arose. Thus, this case is not as simple as reaffirming our pre-*Bruen* precedent.

*Id.* at 647–48 (citations omitted).

*Hamblen* falls in the *Williams*-*Carey* camp, not the *Risner*-*Greeno* camp. Unlike *Greeno*, *Hamblen* didn't show its work. *Hamblen* "simply relied on *Heller*'s one-off reference[s]," and is "therefore inconsistent with *Bruen*'s mandate to consult historical analogs." *Williams*, 113 F.4th at 648.

End of story? Not so much. As discussed, the majority tries to save *Hamblen* by pointing out that *Hamblen* relied on *Heller*'s history. Maj. Op. at 8–9. But (at the risk of repeating myself ad neausseam) *Heller*'s "history" on dangerous and unusual arms consisted of two whole sentences of dicta. After *Bruen*, simply parroting those lines doesn't fly. That gestures at the history without engaging it. *Williams* couldn't have made the point clearer: "[A]pplying *Heller*'s dicta uncritically would be at odds with *Heller* itself, which stated courts

would need to expound upon the historical justifications [for laws] when the need arose." *Williams*, 113 F.4th at 648. And *Williams* has good company. *See Friedman*, 784 F.3d at 409 (Easterbrook, J.) ("[C]ourts should not read *Heller* like a statute rather than an explanation of the Court's disposition."); *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) (noting that we should be "reluctant to place more weight on [*Heller*'s] passing references than the Court itself did." (internal quotation marks omitted)).

*    *    *

Sticking by *Hamblen* is wrong twice over. By keeping the case on life support, the majority opinion conflicts not only with Supreme Court precedent, but with our own circuit precedent about that Supreme Court precedent.

We had it right in *Williams*. We had it right in *Risner*. When we next audit our precedent for *Bruen* compliance, those cases should provide sounder guidance than this one.

**IV.**

For the reasons I've laid out, I part ways with some of the majority's reasoning. But I join the bottom line and agree that we should affirm Bridges's conviction. I concur in part and concur in the judgment.